UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATANYA MATHEWS,

Plaintiff,                                     No. 14-cv-13040

vs.                                            Hon. Gerald E. Rosen

MASSAGE GREEN LLC, et al.,

Defendants.

_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on March 30, 2016

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

I. INTRODUCTION

This hostile work environment/retaliatory discharge case is presently before the

Court on the Motion for Summary Judgment filed by Defendants Massage Green LLC,

Massage Green Management LLC, Massage Green International Franchise Corp., and

MG Utica, LLC d/b/a Massage Green (collectively referred to herein as "Massage

Green").  Plaintiff has responded and Defendants have replied.  Having reviewed and

considered the parties' briefs and supporting evidence, the Court has determined that the

relevant allegations, facts and legal arguments are adequately presented in these

1

submissions, and that oral argument would not significantly aid the decisional process. Therefore, the Court will decide this matter "on the briefs." *See* Eastern District of Michigan Local Rule 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff LaTanya Mathews, an African-American, was employed as a massage therapist by Defendant MG Utica, LLC, from July 15, 2013 until May 11, 2014. MG Utica, LLC is a franchisee of Massage Green International Franchise Corporation ("MGI"). Allie Mallad is the president of MGI. He is also the controlling owner of Massage Green Holdings, Inc., which owns 100% of MGI.[1]

Mallad is also an MGI franchisee: he owns "somewhere between 27 and 32 Massage Green franchises," including MG Utica, LLC. [*See* Mallad Dep. p. 5.] Generally, each of Mallad's Massage Green spa franchises has a store manager; the store managers report to a district manager. [*See* Deposition of Paul Poterek, pp. 6, 10.] The district manager oversees a number of stores and reports to Mr. Mallad. *Id.,* p. 11; Mallad Dep., p. 27.

---

[1] There are two other entities in the Massage Green family of companies -- Massage Green Management LLC, which is also named as a party-defendant in this action, and Massage Green Distributing, Inc. Allie Mallad testified that Massage Green Management LLC's only purpose was to procure the office space for MGI's corporate headquarters, [Mallad Dep., p. 30], and Massage Green Distributing, Inc., was set up to develop business opportunities in the future but currently does no business. *Id.* at p. 40. As for "Massage Green LLC," though listed as a party-defendant in this action, no such entity exists. *Id.* at p. 21.

Before working at MG Utica, LaTanya Mathews worked at other Massage Green spas owned by Mallad, in Troy and Birmingham, Michigan beginning in May 2013. She left the Troy job in July 2013 due to a "conflict" with the store manager. [Mathews Dep., p. 16.] Courtney Redmer, a district manager, suggested that Mathews seek employment at MG Utica since it was a new store and needed massage therapists. *Id.* at 20-21. Mathews later was contacted by Gina Lucaj, the store manager at MG Utica, who offered Mathews a position. *Id.* at 21. Mathews started at MG Utica "a day or two later," on July 15, 2013. *Id.* at p. 22; *see also* Paul Poterek Decl., Defendants' Ex. 1, ¶ 3.

<u>Plaintiff's Allegations of Racial Hostility</u>

Mathews alleges that a month after she started working at MG Utica, in August 2013, Gina Lucaj began to make offensive racial comments, both to clients in the presence of Mathews and to Mathews, personally. [Mathews Dep., pp. 60-66.] Mathews testified that Lucaj repeatedly called her a "black bitch" and a "nigger." *Id.* at 61-62. She also testified that on two to four occasions, clients said to Lucaj in the presence of Mathews that "'I do not want the nigger working on me,'" to which Lucaj responded, "'You don't have to have a nigger working on you, I can get a white person or a Caucasian person.'" *Id*. Mathews testified that Lucaj also made the "black bitch" comment to another female African-American massage therapist, Keyartay Washington. *Id.* at 63-64. However, she said that no such remarks were ever directed at Corey Darnell or Roshandria [LNU], the two other African-American massage therapists who worked

3

at MG Utica. *Id.* at 65, 68.

According to Mathews, Lucaj's racial comments got worse over time and progressed to her "yelling and pretty much screaming" racial insults. *Id.* at 72-73. No MG Utica employee other than Gina Lucaj, however, made such racial comments. *Id.* at 61.

Notwithstanding Lucaj's alleged racially offensive comments, Mathews testified that she loved working at Massage Green, and loved working with all of the people at Massage Green right up until the time that her employment ended. *Id.* at 93-94.

Mathews also testified that Lucaj also made ethnically derogatory and ageist comments to a white male massage therapist, Tomasz Gadecki, repeatedly calling him a "stupid old Pollack" and belittling him about his religious beliefs and his health issues. *Id.* at 66.

Mathews testified that she sent an e-mail and had several phone conversations with Magdalena Ortiz, the district manager, in November-December 2013, regarding Lucaj's comments. *Id.* at 75-76. Ms. Ortiz was MG Utica's district manager from August 5, 2013 until December 13, 2013 when her employment was terminated. [Potarek Decl., ¶ 4; *see also* Mallad Dep., p. 28.]

Lucaj's employment at the Utica store ended on March 30, 2014 when she left to take a job as a district manager at another Massage Green spa. Shortly thereafter, on April 19, 2014, Lucaj was fired for misconduct unrelated to the allegations in this case.

4

<u>Plaintiff's Participation in Tomasz Gadecki's MDCR and UIA Actions</u>

Tomasz Gadecki's employment with MG Utica was terminated on January 7, 2014. [*See* Second Amended Compl., ¶ 20.]  On February 6, 2014, Gadecki filed a charge of discrimination against MG Utica with the Michigan Department of Civil Rights ("MDCR").  *Id.  See also* Gregory Johnson Dep., pp. 8-10.

In connection with his MDCR action, Gadecki identified LaTanya Mathews as a witness who could attest to Gina Lucaj making comments regarding age.  *Id.* at 11. Gregory Johnson was the civil rights investigator assigned to Mr. Gadecki's case. Johnson spoke with Mathews on two occasions.  *Id.* at 11-12.  The first of these conversations, in February 2014, was "very short".  *Id.* at 11, 18.  After Johnson told Mathews he was investigating Mr. Gadecki's charge of discrimination, Mathews told Johnson that she "also had some issues," *id.* at 11, and Johnson "was prepared to take a complaint from her, but then she stated that she had filed with the EEOC."  *Id.* at 11-12. Johnson told her that since she had filed with the EEOC, she needed to talk with the EEOC investigator.  *Id.* at 18.  He testified, "I didn't think it was proper [to discuss Mathews's issues] with the EEOC handling her situation."  *Id.*[2]  Therefore, Johnson

---

[2]  Contrary to what Mathews told Johnson, she had not yet filed with the EEOC at the time of this February 2014 discussion with Gregory Johnson; her EEOC charge alleging race discrimination was not filed until June 19, 2014, after her employment at MG Utica was terminated.  [*See* Dkt. # 43, First Amended Complaint, ¶ 28.]

merely took Mathews's contact information for future reference as a witness with regard to Gadecki's charge.  *Id.* 12.

Johnson's next conversation with Mathews was his witness interview of her in April 2014.  *Id*.  Mathews corroborated Gadecki's statement that Gina Lucaj had said in reference to Gadecki, "He's old, but he acts like a little boy."  *Id.* at 13.  Mathews also told Johnson that "Lucaj ... had told her that she would not promote individuals who were older because she wanted to project a younger image."  *Id.*

After this second conversation with Mathews, Johnson called MG Utica's owner, Allie Mallad, on April 11, 2014, to obtain Gina Lucaj's contact information.  *Id*. at 14.  In that phone conversation, Johnson told Mallad that he had spoken with LaTanya Mathews but "did not give him any details [about their conversations]."  *Id.*  He testified that he never discusses a witness's testimony with anyone else in the case.  *Id.* at 7.

According to Johnson, Mallad did not say anything at all about Ms. Mathews in that phone call.  *Id.* at 14.  However, because Mr. Gadecki had filed a charge and because Mathews had told Johnson that she had filed with the EEOC, he suggested to Mallad that he sit down and talk with both Gadecki and Mathews "to try to resolve it before it got out of hand." *Id.* at 15-16.

Mallad testified that, on Johnson's advice, he did contact Tomasz Gadecki in late April or early May 2014.  [Mallad Dep., p. 106; *see also* Gadecki 7/13/15 Affidavit, Plaintiff's Ex. 1, ¶ 11.]    Mallad never contacted Ms. Mathews.  [Mathews Dep. at 76.]

Tomasz Gadecki suggests in an affidavit dated July 13, 2015 -- i.e., after Defendants filed their motion for summary judgment in this case -- that it was he, not Mallad, who initiated the contact. Gadecki states that he left a voice mail for Allie Mallad at the end of February or early March 2014 regarding his discrimination complaints and the denial of his unemployment benefits. [Gadecki Aff., Plaintiff's Ex. 1, ¶ 10.] According to Gadecki, in that voice mail message, he informed Mallad that three employees had written a letter in support of his unemployment claim, and that LaTanya Mathews was one of those employees. *Id.* He states that it was after he left that voice mail message, in late April or early May 2014, that Mallad called him. *Id*. at ¶ 11.

According to Gadecki, Mallad told him that he was getting in touch with employees who had been terminated or who were having issues at Massage Green, including the key witnesses Gadecki had identified to the MDCR. *Id.* at ¶ 13. Gadecki also claims that Mallad also indicated that he was going to inform his new district manager -- who, at the time, was Paul Poterek -- what he discussed with Gadecki. *Id.* at ¶ 14. Paul Poterek testified, however, that he was not made aware until two weeks before his deposition on May 10, 2015 that Gadecki had filed an MDCR complaint or that LaTanya Mathews participated in the MDCR investigation of Gadecki's complaint. [Poterek Dep., pp. 44-47.]

Besides Mallad, Gadecki and Mathews, the only other person connected with MG Utica contacted by MDCR Investigator Johnson was Gina Lucaj. [Johnson Dep. at 15].

7

Johnson testified that he did not discuss Mathews with Lucaj; he only spoke with her about the allegations that Lucaj had made ageist comments about Gadecki and that she was not promoting older people. *Id.* "[Lucaj] denied having made any comments to anyone of that nature." *Id.*

As indicated, Gadecki also filed a claim for unemployment benefits with the Michigan Unemployment Insurance Agency ("UIA") which was contested by MG Utica. [Second Amended Compl., ¶ 22.] To refute the reasons his employer had given to the unemployment agency for his termination, Gadecki asked Mathews and other massage therapists to write a letter to agency on his behalf. [*See* Mathews Dep., pp. 82-83.] Mathews testified that she submitted the letter supporting Gadecki's UIA claim in March 2014. *Id.*

The Incident That Led to Plaintiff's Termination

The handling of customer tips was the source of much discontent among the massage therapists at MG Utica. Before March 2014, cash tips from customers were given to the receptionist or store manager at the the front desk who would lock them in a drawer or personally retain possession of them until the therapists requested them. [Sandra Martin Dep. pp. 38-39.] The therapists, including LaTanya Mathews, did not like tips being placed in the possession of the receptionist or manager because they felt that the tips would get lost, commingled or confused with other tips, or stolen. [Mathews Dep. pp. 36, 43; Martin Dep., p. 38; Poterek Dep., pp. 71-72.] The therapists wanted the

8

tips to be locked in a lock box and for the therapists to be responsible for the key and be able to retrieve their tips when they saw fit. [Poterek Dep. at 72-73, 76; Martin Dep. at 38.] Mathews testified that "everybody" was complaining about how they got their tips under the prior method. [Mathews Dep. at 49.]

Because of all of the dissatisfaction with the method for the handling of tips, on March 5, 2014, shortly after Paul Poterek took over as MG Utica's district manager, a new procedure was put in place. [Poterek Dep. at 71-72.] Under this new procedure, for cash tips, the customer is given an envelope with the massage therapist's name on the front; the customer places his or her tip into the envelope, and then inserts the envelope into a clear locked box which is kept on the counter of the front desk. *Id.* at 66-67, 78. A sign above the box says, "Massage Green Therapists Greatly Appreciate Gratuity! It is a Gesture of Thanks for Excellent Service! Suggested Gratuity: 60 minutes: $15 - $20; 90 minutes: $20 - $25; 120 minutes: $25 - $30." [*See* Ex. 8.] The therapists have a key to access the box and individually retrieve their tips whenever they want. [Martin Dep., at 38-39, 54; Poterek Dep. at 66-67, 71-72.]

On Friday, May 9, 2014, Sandra Martin and LaTanya Mathews were the only massage therapists at MG Utica. [Martin Dep. at 67-68.] Megan Neill, Gina Lucaj's replacement as store manager, and Courtney Maieritsch, a sales associate/receptionist, were also working that day. *Id.* at 63-64. Martin testified that the following occurred:

> A:     I came out of my session and was going to go on break so I got the
>         key to check the box and [I had] had two clients so I was looking for

9

two tips and there was one envelope in the box.  So I asked --
Megan was working the counter, actually she's the manager and also
the sales associate that day.

* * *

I asked her if I had a charge because that's what you would
assume if there is not a cash tip that hopefully there is a charge.  And
she said no because she witnessed both of my clients put cash tips in
the box.  And I said there is only one envelope here, though.

And she said well, I don't know because I saw both your
clients put an envelope in the box.  And Tanya had been up and
checked tips in between the last session, I guess.  So I asked her if
she would ask Tanya when she came out of session, because I was
leaving for break, if she would ask her if she saw the tip because
what could have happened to it if it was supposed to be in there?

I went on break, I came back and Megan was gone, Courtney was
there.

* * *

I asked Courtney if she knew if Megan had confronted Tanya
[] -- or if she passed on the message for her to ask Tanya and she
said no.

Q:     Then what happened?

A:     I went in the back. When Tanya came out of session I asked her
        myself about the tip.

Q:     And what did Latanya say?

A:     She seemed a little surprised.  She went into her locker, she said
        give me a minute.  She left the break room, came back and handed
        me an envelope with my name on it.  It was wrinkled.  It had been
        opened.  And there was money inside.  I was a little shocked that she
        had it.

10

Q:      You said it had been clear that the envelope had been sealed and it
        had been opened?

A:      Yes.

Q:      And the money was still there?

A:      Yeah.

Q:      Do you recall that there was any money missing?

A:      I would have no way of knowing.

Q:      How much money was there?

A:      There was $15 which is an average tip, that's a good tip.  I mean
        people leave anywhere from five to $20, $25, $30.  It's hard to say
        that.

                                    * * *

Q:      Did Latanya say anything to you?

A:      Yeah, she said she took it by accident.

Q:      Did you believe her?

A:      No.

Q:      Why not?

A:      Because our names are clearly written on the envelope, we're very
        careful.  I mean you know who you  -- how many clients you had,
        how many tips you should have.  I even to this day I don't go in that
        box and just take envelopes without checking them.  Even if I'm the
        only one there because somebody could have left one behind.  It
        happens.  I always look at the name.  I can't imagine why somebody
        wouldn't do that.  Why would you take an envelope without
        checking the name and put it in your pocket, open it, take the money
        out?  Why would you do that if your name isn't on it?

11

Q:      Do you know if Tanya took the money out?

A:      I know it was open.

Q:      Is it possible for two envelopes to get stuck together?

A:      In the box? No. . . .

[Martin Dep., pp. 63-67.][3]

Martin reported the incident to the store manager, Megan Neill, when Neill

returned later that day.  *Id.* at 69, 78.  Neill, in turn, reported the incident to Paul Poterek,

the district manager.  [Poterek Dep., p. 79.]  Poterek then called Sandra Martin and heard

from her personally what she had reported to Megan Neill.  *Id.* at 80-81.  After hearing

what Martin had to say, Poterek told her that "the situation needed to be dealt with."

[Martin Dep., p. 70].  Martin said Poterek did not elaborate on what he meant by that;

just "[t]hat he would handle it."  *Id.*  Martin told Poterek that she hated to see anyone

lose their job because of her, to which Poterek replied, "[T]his isn't because of you, it's

because of someone's own actions that this is happening, not because of anything you

did."  *Id.* at 71.

The next day, Poterek went to the Utica store to personally see the envelopes and

the lock box.  *Id.* at 82.  He later asked for, and was provided with, written witness

---

[3]  Mathews claims to have no recollection of any of the events recounted by
Sandra Martin; she categorically denies ever having had Sandra Martin's tip envelope in
her possession, and further denies ever taking a tip envelope from the tip box with
Martin's name on it.  *See* Mathews Dep., pp. 104-107.

statements from Sandra Martin and Megan Neill, *id*. at 81, and directed Neill to inform

Mathews that her employment was terminated.  Poterek did not interview Mathews.

Rather, he testified that typically it is the store manager's responsibility to notify a

terminated employee that he/she is no longer needed at Massage Green.  *Id*. at 18.

Poterek's reasons for terminating Ms. Mathews included the "loss of trust for the

therapists that their tips would be safe" and the effect of the incident on "team cohesion."

*Id.* at 90.  Poterek also relied on a precedent of already having terminated another

employee responsible for lost or stolen funds.  *Id*.

Poterek testified that he did not speak to Allie Mallad prior to terminating

Mathews's employment.  *Id*. at 83-84.  Mallad testified that he did not have any input

into the termination decision and only learned of it after it had occurred.  [Mallad Dep.,

pp. 79, 91.]

Megan Neill informed Mathews that her employment was terminated on May 11,

2014.  [Mathews Dep., pp. 102-103.]  Neill told Mathews that the decision came from

the "higher-uppers . . .  Paul Poterek and Mr. Mallad."  *Id*.

On July 11, 2014, Mathews filed a charge of racial discrimination, harassment and

retaliation with the EEOC.  Thereafter, she requested and was issued a Right to Sue

letter, and instituted this action.

In her Second Amended Complaint, Plaintiff alleges three claims of a racially

hostile work environment under 42 U.S.C. § 1981 (Count I), Title VII of the Civil Rights

13

Act of 1964, 42 U.S.C. § 2000e(f) ("Title VII") (Count IV), and the Michigan Elliott-Larsen Civil Rights Act (the "ELCRA") (Count VI); and four claims of retaliation under § 1981 (Count II), the Michigan Whistleblowers' Protection Act (Count III), Title VII (Count V), and the ELCRA (Count VII).

## III.   DISCUSSION

### A.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge,

14

set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply the foregoing standards in deciding Defendants' motion for summary judgment in this case.

B.   PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS

Hostile work environment claims arising under Title VII and § 1981 are analyzed using the same standards. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Williams v. CSX Transportation Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act. *Id.*[4]

Defendants in this case challenge only Plaintiff's satisfaction of the fourth element of a hostile work environment claim.

_____

[4] The standards under Michigan's Elliott-Larsen Act are similar, except that an employer may be held liable for the creation of a hostile work environment only if it "failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 614 N.W.2d 910, 915-16 (2000).

15

This Court described the showing necessary to establish the fourth element of a *prima facie* hostile environment claim in *Hall v. Sky Chefs, Inc.*, 784 F. Supp. 2d 811 (E.D. Mich. 2011):

> As the Sixth Circuit has explained, a hostile work environment exists -- and, thus, the fourth prong of a *prima facie* case is established -- only where a plaintiff is subjected to conduct that is "sufficiently severe or pervasive to alter the conditions of [her] employment." *Abeita v. TransAmerica Mailings, Inc*., 159 F.3d 246, 251 (6th Cir.1998) (internal quotation marks and citations omitted). The conduct in question "must be judged by both an objective and a subjective standard" -- that is, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, **and** the victim must subjectively regard that environment as abusive." *Abeita*, 159 F.3d at 251 (internal quotation marks and citations omitted). Among the factors to be considered in determining the existence of a hostile work environment are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark* [*v. United Parcel Service*, 400 F.3d 341, 351 (6th Cir.2005)] (internal quotation marks and citation omitted). "The harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Clark*, 400 F.3d at 351.

*Hall*, 784 F. Supp. at 824 (quoting *Harrison v. Oakland County*, 612 F. Supp. 2d 848, 855-56 (E.D. Mich. 2009) (emphasis added).

With regard to the assessment of the subjective component, the Sixth Circuit has instructed that "'the adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance.'" *Williams v. General Motors, Corp.*, 187 F.3d 553, 567 (6th Cir. 1999) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367 (Ginsburg, J.

16

concurring)). To show such interference, "'the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment'", but she needs to "'show that the harassment made it more difficult to do the job.'" *Id.* (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988). Plaintiff here has made no such showing.

With regard to her claim of a racially hostile work environment, Plaintiff offers only her testimony that Gina Lucaj, the former store manager who had hired her, "repeatedly" called her a "black bitch" and a "nigger," and that on two to four occasions, she heard clients say "I do not want the nigger working on me," to which she heard Lucaj respond, "You don't have to have a nigger working on you, I can get a white person or a Caucasian person." [Mathews Dep., pp. 61-62.] She also testified that Lucaj made the "black bitch" remark to another African-American massage therapist, Keyartay Washington. *Id.* at 63-64. Although Mathews claims that Lucaj's comments got worse over time and progressed to her "yelling and pretty much screaming" racial insults, she admitted that no such remarks were ever directed at the two other African-American massage therapists who worked there, nor did any MG Utica or Massage Green employee other than Lucaj make any racial comments. *Id.* at 61, 72-73.

Significantly, Plaintiff has not identified sufficient evidence in the record to show that she perceived Lucaj's conduct and remarks as interfering with her work performance, altering the conditions of her employment, or giving rise to a hostile or

17

abusive work environment.  To the contrary, Plaintiff herself testified in her deposition that she loved her job, loved working at Massage Green and loved working with everyone there, right up until the time that her employment ended.  *Id.* at 93-94.

Plaintiff points to her reporting of Lucaj's comments to then District Manager Magdelena Ortiz as establishing that she subjectively regarded the environment as abusive.  While evidence that a plaintiff complained to management about harassment may satisfy the subjective prong of a hostile work environment claim as, for example, in *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 886 (6th Cir. 2008), where the plaintiffs had complained about racial harassment "repeatedly over the course of six years" to two different supervisors, their union steward, two different managers, and the company's vice president of human resources, *id.*, the Court finds insufficient evidence to satisfy the subjective component here.

Unlike the plaintiffs in *Bailey*, Plaintiff here admits that the only manager she complained to about Gina Lucaj's comments was Magdalena Ortiz.  She testified that she first complained to Ortiz in a November 2013 e-mail and had "several" phone conversations with her after that e-mail.[5]  Ms. Ortiz left Massage Green in mid-December

---

[5]  Though Plaintiff originally testified she complained to Ortiz about the racial comments in an e-mail, when confronted with the e-mails she sent to Ms. Ortiz, she retracted from that position:

> Q:     Just in terms of your complaints about the race comments, was that put in an e-mail to Magdalena?

18

2013.  That Plaintiff did not complain to anyone else for the next 6 months, coupled with

her testimony describing her work environment in favorable terms, indicates that Plaintiff

did not perceive Ms. Lucaj's remarks as sufficiently severe or pervasive to interfere with

---

A:      Most of it was put in an e-mail to Magdalena.  I telephoned her,
        text[ed] her and put [it] in an e-mail.

Q:      Again I have seen the e-mails where you are complaining about the
        tips.  I haven't seen any e-mail where you are complaining about the
        race comments.  Did you --

A:      It may have been worded as unprofessional of a staff member.  It
        may have been worded that they were coming into work intoxicated,
        maybe drunk.

Q:      Okay.  Well, then I do have that e-mail. . . .
                Magdalena was the only one in management above --

A:      Right.

Q:      -- the store level that you complained [about] it?

A:      She was the next [in the] chain of command.

                                    ***

Q:      How many phone calls did you have with Magdalena about the racial
        comments?

A:      Several.  I don't remember how many, but it was several.

Q:      Do you remember when they were?

A:      From November of 2013 up until, you know -- until I didn't hear
        from her any more.  That was it.

[Plaintiff's Dep. p. 74-76.]

her work performance or alter the conditions of her employment.[6]

While the Court finds the comments of Gina Lucaj that Plaintiff identified in her deposition to be reprehensible and inappropriate in any setting, the Court emphasizes here that it has not been called upon to decide whether Lucaj's comments would satisfy the objective prong of the hostile work environment standard -- i.e., whether the remarks were "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Hall*, 784 F. Supp. 2d at 826 (internal punctuation and citation omitted). Rather, the Court has been called upon to consider only Plaintiff's showing as to the subjective prong of this standard -- that is, whether Plaintiff subjectively regarded her work environment as hostile or abusive. *Id.*

Once Defendants advanced this challenge, it was Plaintiff's obligation under Rule 56 to marshal evidence in the record which, viewed in her favor, would establish this element of a *prima facie* hostile work environment claim. Plaintiff has failed to meet this

---

[6] Plaintiff also states that she also complained to the MDCR. However no evidence of record bears this out. The record evidence establishes only that in the course of her initial discussion with MDCR Investigator Gregory Johnson about Tomasz Gadecki's allegations of age and religious discrimination, Plaintiff told Johnson that she also had her own "issues" with Massage Green, but there is no evidence in the record presented to the Court of any specific complaints of racial discrimination or harassment made by Plaintiff to the investigator, nor any evidence that she ever complained to him that she subjectively viewed her work environment abusive or hostile. Indeed, as Mr. Johnson testified, because Plaintiff had indicated to him early on that she had filed a claim with the EEOC, he refused to discuss Plaintiff's claim with her and limited their discussion to events she could attest to with regard to Tomasz Gadecki's complaints of age and religious discrimination.

burden.

For all of these reasons, the Court will grant Defendants' motion for summary judgment on Counts I, IV and VI.

C. PLAINTIFF'S RETALIATION CLAIMS

Plaintiff also alleges claims of retaliatory discharge based on (1) her reporting racial harassment by Gina Lucaj to Massage Green management, in violation of Title VII, Section 1981 and the ELCRA; and (2) her participation in an MDCR investigation and an unemployment action concerning Tomasz Gadecki, in violation of Title VII, Section 1981, the ELCRA and the WPA.

 The Civil Rights Statutes

The federal civil rights statutes, as well as the Michigan Elliott-Larsen Civil Rights Act, prohibit retaliatory conduct by an employer in two situations: (1) when an employee has made a charge of discrimination, filed a complaint of discrimination, or otherwise participated in enforcement proceedings ("the participation clause"); or (2) when an employee "has opposed a violation [of the Act ]" (the "opposition clause"). *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1312 (6th Cir. 1989).  *See also CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 454-455, 128 S.Ct. 1951 (2008); *Herrera v. Churchill McGee LLC*, 545 F. App'x 499, 500-501 (6th Cir. 2013).

As with status-based discrimination claims, a retaliation claim under the federal or state civil rights laws can be established "either by introducing direct evidence of

retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 538 (6th Cir.2008); *Cuddington v. United Health Servs., Inc.*, 298 Mich. App. 264, 275-76, 826 N.W.2d 519 (2012). Plaintiff here has not presented direct evidence of retaliation. Therefore, whether Plaintiff has made out a claim of retaliation cognizable under the civil rights statutes will be determined by application of the *McDonnell Douglas/Burdine*[7] burden-shifting paradigm.

In order to state a *prima facie* claim of retaliation under Title VII or Section 1981, Plaintiff must establish:

1. That she participated in a protected activity;[8]

2. That the company was aware of her participation;

3. That the company subsequently took action adverse to plaintiff; and

4. That there is a causal connection between the protected activity and the adverse employment action.

*Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1079 (6th Cir. 1999); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997) *Canita v. Yellow Freight Systems*, 903 F.2d 1064, 1066 (6th Cir. 1990), *cert. denied*, 498 U.S. 984 (1990); *Herrera v. Churchill*

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

[8] A "protected activity" includes opposing any employer practice that is unlawful under Title VII and participating in a Title VII investigation. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir.), *cert. denied*, 531 U.S. 1052 (2000); *Booker v. Brown Williamson Tobacco Co., Inc.*, *supra*, 879 F.2d at 1312.

*McGee LLC*, *supra,* 545 F. App'x at 500-501.[9]

To satisfy the fourth *prima facie* element, the plaintiff must show that the complained of adverse employment action would not have occurred if she had not engaged in the protected activity.  *Univ. of Texas Southwestern Medical Center v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534.)[10]

---

[9]  The standard required to make out a *prima facie* retaliation claim under the Michigan Elliott-Larsen Act is similar.  To make out a claim under the Michigan Act requires that the plaintiff establish (1) that he opposed violations of the Act or participated in activities protected by the Act, and (2) that the opposition or participation was *a significant factor* in the adverse employment decision.  *Booker v. Brown and Williamson*, 879 F.2d at 1310.  The *significant factor* standard "requires a showing of more than a 'causal link.'  A factor can be a 'cause' without being 'significant.'  Only the latter is sufficient to show retaliatory discharge."  *Id.*, quoting *Polk v. Yellow Freight System, Inc.*, 801 F.2d 190, 199 (6th Cir. 1986).

[10]  Prior to *Nassar*, courts required that plaintiffs show only that the protected activity was a "motivating factor" in the adverse employment decision.  *See Nassar*, 133 S.Ct. at 2626.  In *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 783 F.3d 634 (6th Cir. 2015), the Sixth Circuit acknowledged that *Nassar* altered the causation element: "The Supreme Court has held that the fourth part of the test 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* at 649 (quoting *Nassar*, 133 S.Ct 2517, 2533 (2013).  And, the *Nassar* "but-for" standard has been applied as a *prima facie* element in a number of unpublished Sixth Circuit decisions, as well a number of district court cases.  *See, e.g., Goodsite v. Norfolk Southern Ry. Co.*, 573 F. App'x 572, 582-584 (6th Cir. 2014); *Beard v. AAA Michigan*, 593 F. App'x 447, 450-452 (6th Cir. 2014); *Greene v. U.S. Dep't of Veteran Affairs*, 605 F. App'x 501, 504-506 (6th Cir. 2015); *Williams v. Serra Chevrolet Automotive, LLC*, 4 F. Supp. 3d 865, 867, 877-880 (E.D. Mich. 2014); *McQuail v. Tennessee Tech. Univ.*, 69 F. Supp. 3d 701, 714 (M.D. Tenn. 2014); *Taylor*

23

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir.2008). The plaintiff then must demonstrate that the proffered reason was not the true reason for the employment decision but was mere pretext. *Id*. (citations and quotation marks omitted). An employee can prove pretext by showing that the proffered reason: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk Western RR, Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)). However, if an employer has an honest belief in its proffered non-retaliatory reason for discharging an employee, the employee cannot establish that the reason was pretext by showing the employer was ultimately incorrect. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir.2008) (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.2001)). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment

---

*v. Donohoe*, 66 F.3d 993, 1001, 1004 (W.D. Tenn. 2014); *Van Buren v. Ohio Dep't of Public Safety*, 996 F. Supp. 2d 648, 666-667 (S.D. Ohio 2014). Other circuits also agree that the "but-for" standard enunciated in *Nassar* heightened the plaintiff's *prima facie* burden. *See e.g., Wright v. St. Vincent Hospital Sys.*, 730 F.3d 732, 738 n.5 (8th Cir. 2013); *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n. 1 (7th Cir. 2014); *Verma v. Univ. of Pennsylvania*, 533 F. App'x 113, 119 (3d Cir. 2013). The Court agrees with these cases and holds that "but-for" causation is required to make out a *prima facie* retaliation claim under Title VII and Section 1981.

24

action." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 414 (6th Cir.2008) (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir.1998)).

<u>The Michigan Whistleblower's Protection Act</u>

The Michigan Whistleblower's Protection Act similarly prohibits retaliation by an employer.  It provides, in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

M.C.L. § 15.362.

Michigan courts have clarified that WPA claims are to be analyzed under the same burden-shifting framework used in retaliatory-discharge claims brought under Title VII and the Elliott-Larsen Civil Rights Act.  *See Roulston v. Tendercare (Michigan), Inc.*, 239 Mich. App. 270, 280-281, 608 N.W.2d 525 (2000); *Anzaldua v. Band*, 216 Mich. App. 561, 573, 550 N.W.2d 544, 552-53 (1996); *Hopkins v. City of Midland*, 158 Mich. App. 361, 378, 404 N.W.2d 744, 751(1987).

To establish a *prima facie* case under the WPA, the plaintiff must show that (1) she engaged in a protected activity as defined by the Act; (2) the defendant discharged her; and (3) a causal connection exists between the protected activity and the discharge.

25

*Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210, 212 (1998). A "protected activity" under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation. M.C.L. § 15.362; *Chandler, supra*. To establish a causal connection between the protected activity and the termination (the adverse employment action), the plaintiff must present evidence that the defendant had "objective notice" of her protected activity. *Richards v. Sandusky Cmty. Schs.*, 102 F. Supp. 2d 753, 763 (E.D. Mich.2000), *aff'd,* 23 F. App'x 466 (6th Cir. 2001) (citing *Roberson v. Occupational Health Ctrs. Of Am., Inc.*, 220 Mich. App. 322, 326, 559 N.W.2d 86, 88 (1996) ("'An employer is entitled to objective notice of a report or threat to report by the whistleblower.'" (quoting *Kaufman & Payton, P.C. v. Nikkila*, 200 Mich. App. 250, 257, 503 N.W.2d 728, 732 (1993))).

Once a plaintiff makes a *prima facie* showing, the burden then shifts to the defendant to provide a legitimate, non-retaliatory explanation for terminating the plaintiff's employment. *Roulston, supra.* The plaintiff must then prove that the defendant's articulated reason was not the real reason for the termination but only a pretext. *Id.*

1. Plaintiff Has Not Made Out a Retaliation Claim Based on Her Reporting of Racial Harassment to Management

Plaintiff alleges that she complained about racial harassment by Gina Lucaj to Magdalena Ortiz, a Massage Green district manager. Ortiz was the only Massage Green

manager to whom Plaintiff complained about Gina Lucaj.  [*See* Plaintiff's Dep., pp. 73-77.]  Plaintiff testified that she reported Lucaj's harassment to Ms. Ortiz in a November 2013 e-mail.  [Plaintiff's Dep., p 73.]  "After that it [sic] was some telephone conversations about the matter."  *Id.*  [Plaintiff's Dep., pp. 75-76.]  Ms. Ortiz's employment with Massage Green was terminated on December 13, 2013. [*See* Poterek Decl., ¶ 4; Mallad Dep., p. 28.]

Other than a generic statement of law in a footnote in her Response Brief that "reporting race harassment to management . . . constitutes protected activity under 42 U.S.C. § 1981, Title VII, and Elliott Larsen," [Plaintiff's Response Brief, p. 11, footnote 2], Plaintiff does not develop or otherwise address her management report-based claim of retaliation anywhere in her Response.[11]

---

[11]  Footnote 2 follows Plaintiff's summary of the required elements civil rights and whistleblower's act retaliation claims in her introductory paragraphs to her response to Defendants' motion for summary judgment on her retaliation claims. The full text of Plaintiff's footnote 2 is as follows:

> The record reflects that Plaintiff participated that Plaintiff participated in Mr. Gadecki's MDCR investigation based on his complaints of age national origin and religious discrimination (Johnson Dep. at 13) ***as well as reporting race harassment to management***, (Pl. Dep. at 75-76).  The former constitutes protected activity under 42 U.S.C. § 1981, Title VII, Elliott Larsen, and the WPA -- the latter constitutes protected activity under 42 U.S.C. § 1981, Title VII and Elliott Larsen.  *See Strouss v. Michigan Dep't of Corr.*, 75 F. Supp. 2d 711, 724 (E.D. Mich. 1999).

[Plaintiff's Response Brief, p. 11, n. 2 (emphasis added).]

The discussion of her retaliation claims in her Brief that follows, however,

Sixth Circuit jurisprudence is clear:  a plaintiff is deemed to have abandoned a claim when she fails to address it in response to a motion for summary judgment.  *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *Hicks v. Concorde Career Coll.,* 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 534-25 (6th Cir. 2006) (recognizing that the failure to respond properly to summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.,* 65 F. App'x 19, 24-25 (6th Cir. 2003).

 Accordingly, the Court concludes that Plaintiff here abandoned her claims of retaliation based on her complaints to Magdalena Ortiz in November-December 2013 about racial harassment by Gina Lucaj.

However, even if this claim is not deemed abandoned, Defendants are nonetheless entitled to summary judgment as Plaintiff cannot show a sufficient causal nexus between her report of harassment to Magdelena Ortiz in November 2013 and the termination of her employment on May 11, 2014 to raise an inference that but for her report she would not have been terminated.  The only possible causal link Plaintiff can proffer is a

_____

contains no mention whatsoever of a claim of retaliation based on "reporting race harassment to management."  Rather, Plaintiff only discusses her participation in Mr. Gadecki's MDCR action and Defendants' knowledge of that participation.  *See* Plaintiff's Brief, pp. 10-19.

temporal one -- i.e., that she was terminated after she complained to Ortiz about Gina Lucaj's comments.

In general, "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir.), *cert. denied*, 522 U.S. 888 (2007) (quoting *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363–64 (6th Cir.2001)); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir.2000). However, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity," temporal proximity may be enough. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008). But "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id*. In *Mickey*, the plaintiff was found to have satisfied his burden of proving causation where his employer fired him the very day it learned of his EEOC charge. *Id*. at 526.

By contrast, here, Plaintiff's complaint to Magdalena Ortiz predated her termination by six months. "[C]ases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Nguyen v. City of Cleveland*, *supra*, 229 F.3d at 567 (citation omitted); *see also Clay v. United Parcel Service, Inc.*, 501 F.3d 695 (6th Cir. 2007) (holding temporal

29

proximity of six months between the filing of plaintiff's OCRC/EEOC complaint and his termination insufficient to satisfy causation element); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986) (four-month period of time insufficient to establish a *prima facie* case of retaliation); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (stating that three months between protected conduct and adverse action was too long for the fact finder to infer causation); *but see Imwalle v. Reliance v. Reliance Medical Prod., Inc., supra*, 515 F.3d at 549 (finding three months time between plaintiff's filing of an EEOC complaint and his termination sufficient proximity to support an inference of a causal connection).

Further, Plaintiff admitted in her deposition that Ortiz was the only Massage Green manager to whom she reported Gina Lucaj's racial comments.  Ms. Ortiz was not working at Massage Green at the time of Plaintiff's termination; indeed Ortiz left Massage Green *five months before* Plaintiff was terminated, and there is no evidence of record showing that any other Massage Green manager was at any time made aware of Plaintiff's November - December 2013 complaints to Ortiz.

For these reasons, the Court finds that Plaintiff has not established a causal nexus between her reports of racial harassment by Gina Lucaj and her termination of employment. Accordingly, the Court will enter summary judgment in favor of Defendants on Plaintiff's retaliation claims based on her reports of racial harassment to Massage Green management.

2.  Plaintiff Has Failed to Make Out a Cognizable WPA Claim of Retaliation Based on Her Participation in Tomasz Gadecki's Unemployment Action

Plaintiff also alleges in her Complaint that Defendants retaliated against her because of her involvement in Tomasz Gadecki's MDCR and unemployment actions. With respect to the latter, as discussed above, a plaintiff is deemed to have abandoned a claim when the plaintiff fails to address it in response to a motion for summary judgment. *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013), and cases discussed therein. Plaintiff does not raise any argument in her Brief in Response to Defendants' Motion for Summary Judgment regarding retaliation based on her participation in Gadecki's unemployment action.   Therefore, the Court views this aspect of her retaliation claim to have been abandoned.  In any event, even if not abandoned, Plaintiff cannot succeed on the merits of such a claim.

According to Plaintiff's own testimony, her only involvement with Gadecki's unemployment claim was that

> in March [2014], Mr. Gadecki got a letter from unemployment and it was stating that he was being this belligerent employee, he wasn't coming in to work on time, he wasn't doing his job; and at the time, Mr. Gadecki asked me and other therapists if we could write a letter stating that, you know, these things are accusations.  So by me working with him, I agreed to write a letter for him and other therapists did too.  We wrote a letter saying that these accusations that we read, they are false.

 [Plaintiff's Dep., p. 82.]

The only possible basis for a retaliation claim based upon Plaintiff's involvement with Gadecki's unemployment action would be a violation of the Michigan

Whistleblowers' Protection Act.  The activities about which Plaintiff testified do not constitute protected activities under the WPA.

"Protected activity" under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation. *Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210, 212 (1998); M.C.L. § 15.362.  The plain language of the statute does not protect plaintiff. The ordinary and generally accepted meaning of the words "reports," "about to report," and "requested by a public body to participate in an investigation" do not encompass Plaintiff's actions with respect to Gadecki's unemployment action.  The letter Plaintiff wrote to the UIA was not written at the request of a public body; a private individual, Tomasz Gadecki requested that Plaintiff write the letter.  Further, the letter merely disputed the employer's allegations that Gadecki was belligerent and was not doing his job.  It was not a report of a violation of a law, regulation or rule.  In sum, the WPA is wholly inapplicable with regard to Plaintiff's letter to the UIA written on behalf of, and at the request of, Tomasz Gadecki in support of his claim for unemployment benefits.

3. Plaintiff's Claim of Retaliation Based on her Participation in the MDCR Investigation of Tomasz Gadecki's Allegations of Discrimination

Plaintiff's principal retaliation claim is predicated on her participation as a witness in the MDCR investigation into Tomasz Gadecki's complaints of age and religious discrimination.  Defendants do not dispute Plaintiff's satisfaction of the first or third

32

elements of a retaliation claim:  Plaintiff participated in a protected activity and that the

company subsequently discharged her.  Defendants do, however, dispute her satisfaction

of the second and fourth elements of a *prima facie* case:  whether Plaintiff has

established that the company was aware of her participation and whether the related

causal nexus element is satisfied.[12]

Defendants argue that the sole decision-maker with regard to Ms. Mathews's

termination was Paul Poterek and Poterek had no knowledge of Mathews's protected

activity.  Therefore, Defendants claim that Plaintiff cannot establish the second *prima*

*facie* element of her claim.  However, Plaintiff has presented evidence suggesting that

Poterek was not actually the *sole* decision-maker.  Plaintiff testified that when she was

informed of her termination by Megan Neill, who was at the time the store manager at

MG Utica, Neill told Plaintiff that the decision to terminate her came from "the higher

uppers . . . Paul Poterek *and* Mr. Mallad." [Plaintiff's Dep., p. 103 (emphasis added).]

There is no dispute that Allie Mallad, the owner of MG Utica and president of

MGI, had knowledge of Ms. Mathews's participation as a witness in Tomasz Gadecki's

MDCR action:  Gregory Johnson, the MDCR investigator, testified that he informed

Mallad himself that Mathews was identified by Gadecki as a witness who could testify

about his discriminatory treatment.  Allie Mallad testified that he sometimes was

---

[12]  As set forth above, the employer's knowledge is treated as a causation element
in the Whistleblower's context.  *See Richards v. Sandusky Cmty. Schs.,* 102 F. Supp. 2d
at 763, and cases cited therein.

consulted by managers regarding employee terminations, and he specifically testified that Paul Poterek consulted him on terminations (though at his deposition he said he "d[id]n't remember" whether he was consulted on Ms. Mathews's termination). Both Mallad and Poterek admitted to regular meetings and discussions -- on the phone, by email, and face-to-face.

"'[K]nowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action.'" *Hicks v. SSP America, Inc.*, 490 F. App'x 781, 785 (6th Cir. 2012) (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 553 (6th Cir. 2002)). In *Hicks*, the Sixth Circuit reversed the district court's determination that the plaintiff had failed to make out a *prima facie* case of retaliation where the evidence of record showed that two co-workers who knew that the plaintiff filed charges of discrimination had ongoing interactions with the supervisor who made the decision to terminate the plaintiff. The appellate court held that the co-workers' knowledge of the charges, coupled with the supervisor's ongoing interactions with the co-workers during the relevant period, supported an inference that the supervisor, who made the decision to terminate Hicks, knew of the charges prior to Hicks's termination date. *Id*. The same is true in this case. Viewing the evidence of record in a light most favorable to the Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence to support an inference that Poterek knew of Plaintiff's participation as a witness for Tomasz Gadecki in connection

34

with his MDCR action by virtue of his ongoing interactions with Allie Mallad, the owner of the business, who specifically had such knowledge.

Turning to the fourth *prima facie* element, as an initial matter, the Court notes that neither party addressed or even mentioned the Supreme Court's 2013 *Nassar* decision which, as indicated above, altered the causation element of a Title VII retaliation claim. In discussing causation, the parties here continue to rely on cases decided before *Nassar*. As noted, pursuant to *Nassar* and its progeny, to establish causation, Plaintiff must prove "the desire to retaliate was the but for cause of" her termination -- that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2528, 2533.

Plaintiff claims the causation element is satisfied here by virtue of the close proximity of time of her termination to when her employer learned of her participation in Gadecki's MDCR action, i.e., a period of time less than two months.  In support of this argument Plaintiff cites *Weigel v. Baptist Hosp. of Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002).  Plaintiff's reliance on *Weigel* is misplaced. *Weigel* was an ADEA case decided in 2008, before the Supreme Court's decision in *Gross v. FBL Financial Services, Inc*., 557 U.S. 167, 174, 129 S.Ct. 2343 (2009), which held that all ADEA claims are analyzed under a "but-for" causation standard.  *Gross* and *Nassar* undermines *Weigel* and the cases it relied upon, *i.e.*, *Nguyen v. City of* Cleveland, 229 F.3d 559, 563 (6th Cir. 2000) and *Johnson v. University of Cincinnati,* 215 F.3d 561, 582 (6th Cir.

35

2000), holding that "[a] causal link may be shown through knowledge combined with closeness in time." *Weigel*, 302 F.3d at 381 (quoting *Johnson*, 215 F.3d at 582). Under the stricter "but-for" causation standard, temporal proximity, standing alone, is not enough. *Williams v. Serra Chevrolet Automotive LLC*, 4 F. Supp. 3d at 879.

Applying the teachings of *Nassar* and *Gross* here, temporal proximity alone is not enough to allow a reasonable inference of "but-for" causation, an essential element of Plaintiff's retaliation claims. Other than the temporal proximity between her employer's knowledge of her protected activity and her termination, Plaintiff presents no evidence that "but-for" Defendants' desire to retaliate against her for that protected activity she would not have been terminated. Therefore, Plaintiff has failed to make out a *prima facie* claim of retaliation.

Assuming *arguendo* that Plaintiff has made out a *prima facie* case, the burden of production shifts to Defendants to articulate a non-retaliatory reason for Plaintiff's termination. Defendants have done so here: Plaintiff was fired because she was found to have the tip envelope of another therapist in her possession. *Russell v. University of Toledo*, 537 F.3d at 609. Therefore, the burden shifts back to Plaintiff to demonstrate that the Defendants' reason was pretextual. *Id.* An employee can prove pretext by showing that the proffered reasons "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk Western RR, Inc.*, 552 F.3d at 502 (citing *Manzer v. Diamond*

36

*Shamrock Chems. Co.*, 29 F.3d at 1084)).  Plaintiff has the ultimate burden of proving

that her discharge would not have occurred if she had not engaged in the protected

activity.  *Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. at 2534.

Plaintiff here denies ever having the tip envelope of Sandy Martin (the other

therapist) in her possession.  However, as indicated above, if an employer has an honest

belief in its proffered non-retaliatory reason for discharging an employee, the employee

cannot establish that the reason was pretextual by showing that the employer was

ultimately incorrect.  *Allen v. Highlands Hosp. Corp.*, 545 F.3d at 398.  *See also Curry v.*

*SBC Communications, Inc.*, 669 F. Supp. 2d 805 (E.D. Mich. 2009) ("In determining if

the plaintiff[] ha[s] raised a genuine issue of material fact as to pretext, the Court should

consider not whether the plaintiff[] actually breached the defendant's rules, but rather

whether the defendant had an honestly held belief that [she] had committed a violation of

the rules." *Id.* at  828 (quoting *Allen v. Highlands Hosp. Corp.*, *supra*)).

> The key inquiry in assessing whether an employer holds such an honest
> belief is whether the employer made a reasonably informed and considered
> decision before taking the complained-of action.  An employer has an
> honest belief in its rationale when it reasonably relied on the particularized
> facts that were before it at the time the decision was made.  We do not
> require that the decisional process used by the employer be optimal or that
> it left no stone unturned.

 *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007), *cert.*

*denied*, 552 U.S. 1258 (2008) (internal citations omitted).  The "law does not require

employers to make perfect decisions, or forbid them for making decisions that others may

37

disagree with." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997).

Plaintiff was terminated after District Manager Paul Poterek twice spoke with Sandra Martin, the therapist who found Plaintiff in possession of her [Martin's] tip envelope. He asked, and was told that the envelope was clearly marked with Martin's name on it. He physically visited the Utica store and inspected the tip box and took stock of the envelopes marked with the therapists' names on them as part of his determination that a mistake was unlikely. Poterek was also told by Megan Neill, the store manager, that Mathews retrieved a tip envelope from the box shortly before Martin went to the box and was also told that no other therapists had been at the box in the interim. He asked Martin and Neill to write up their recollection of the incident. The odd conduct of Mathews when Martin asked if she had taken Martin's tip -- going to her locker, leaving the room and returning with the ripped open envelope -- further indicated suspect circumstances.

While prior tip issues generally centered around a concern of the therapists that the receptionist/store manager was responsible for missing tips, the issue involving Mathews was the first time there had been an issue among the therapists with the locked box. This further persuaded Poterek that termination was appropriate because of the effect of the Mathews incident would cause a "loss of trust" among the therapists and negatively affect "team cohesion" if she stayed employed.

The Court concludes that the foregoing facts establish that Defendants had an honest belief in its proffered non-retaliatory reason for discharging Plaintiff. To the extent that Plaintiff argues that Poterek's failure to interview her in investigating the tip envelope issue before deciding to terminate her employment demonstrates pretext, Poterek testified that after he heard Sandy Martin's and Megan Neill's separate accounts of the incident and reviewed the other evidence, he did not believe it was necessary to also talk to Plaintiff about it. [Poterek Dep., pp. 84-85.] It is not for the Court to question the soundness of the decision not to interview Plaintiff but simply to determine "whether the employer gave an honest explanation of its behavior." *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir.2004).

Mathews also attempts to argue that the stated reason was insufficient to warrant her discharge because therapists have been accusing management of stealing tips and no member of management had been fired for that reason. But the difference between the Plaintiff's incident and the other accusations was that no member of management was every found to be in possession of another therapists tip money, as was the case with Plaintiff. Also, the accusation regarding managers stealing tips was before Poterek was the District Manager and before the installation of the lock box for tips. Moreover, Poterek had previously fired another employee arising out of a situation of missing funds. Therefore, Plaintiff cannot show pretext on these grounds.

As the Supreme Court made clear in *Nassar,* Plaintiff's burden is to establish that

39

her protected activity was the "but-for cause" of her termination -- in other words, to prove that the real reason for her termination was unlawful retaliation for her statutorily-protected activities and not for taking Sandy Martin's tip. *Nassar*, 133 S.Ct. at 2533; *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767-770 (6th Cir. 2015). A plaintiff cannot establish but-for causation "if her firing was prompted by both legitimate and illegitimate factors." *Nassar*, 133 S.Ct. at 2533 (internal quotation marks omitted).

Although, here, there may have been some slight overlap, timing-wise, between Plaintiff's support of Tomasz Gadecki's MDCR action and her termination, the protected activity was not close enough in time to Plaintiff's firing, and even if it were, "temporal proximity cannot be the sole basis for finding pretext." *Id.,* 782 F.3d at 767 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir.2012)). Plaintiff, therefore, was required to produce additional evidence of pretext. This she has failed to do.

For all of the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's retaliation claims.

CONCLUSION

For the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment **[Dkt. # 48]** is GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case is DISMISSED, in its entirety, WITH PREJUDICE.

40

Let Judgment be entered accordingly.

s/Gerald E. Rosen
United States District Judge

Dated:  March 30, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 30, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

41